**·UNITED STATES of America, Plaintiff,**

v.

**Deborah ELLIS, Defendant.**

No. 98–7057M.

United States District Court, D. Colorado.

July 25, 1998.

Carl O. Graham, Colorado Springs, CO, for Plaintiff.

Shaun C. Kaufman, Colorado Springs, CO; for Defendant.

### MEMORANDUM OPINION AND ORDER

BORCHERS, United States Magistrate Judge.

THIS MATTER came before the Court for trial in Colorado Springs on June 10, 1998.

The prosecution was represented by Heather Masten, Special Assistant United States Attorney, and Defendant was represented by Shaun Kaufman, attorney at law.

Defendant consented to have the trial heard by a United States Magistrate Judge. She further waived her right to a jury trial. Defendant through her counsel filed a motion to suppress evidence, and that motion was heard during the course of the trial. After conclusion of all testimony and argument by counsel, the Court took this matter under advisement. Further argument will be waived.

### I.

The testimony presented at trial established the following. On March 27, 1998, Specialist Michael Duriech, a member of the United States Army stationed at Fort Carson, Colorado, travelled to a local Colorado Springs tavern called Lorabelles. He was accompanied by another soldier who also was stationed at Fort Carson.

Specialist Duriech met Defendant while at Lorabelles. Defendant was there with a female friend. The meeting was not planned, but merely one that occurred during the evening at the tavern. Specialist Duriech testified that he consumed a lot of alcoholic beverages during the evening of March 27th and early morning hours of March 28th. He admitted that he was under the influence of alcohol after a period of time.

At some point, Defendant asked Specialist Duriech if he wanted "to go get high." Duriech said no, but he did get into a vehicle that was driven by Defendant. Specialist Duriech indicated that he observed Defendant and her friend smoke marijuana, as he recognized the smell of it. He testified that both used a "dugout" which is a wooden box used to smoke marijuana.

Specialist Duriech testified that, after driving for a period of time, Defendant went back to Lorabelle's. The tavern had closed, and Defendant and his friend were concerned about getting back to the base. Duriech asked Defendant for a ride back to Fort Carson, and she agreed to do so. Defendant again drove the vehicle, and Duriech and his

fellow soldier road in the rear seat back to the base.

Specialist Duriech indicated that there was the smell of marijuana in the car. It came from the front seat. He stated that he had not smoked any marijuana at anytime.

Duriech testified that the car approached Gate 20 at Fort Carson. Defendant drove through the gate that was open, but was stopped at a roadblock inside the base. Duriech noticed a military policeman who motioned to Defendant to pull into an area cordoned off by traffic cones. Defendant had a difficult time negotiating the cones.

Duriech heard a comment from one of the military police officers that they were being stopped at a random checkpoint. All individuals in the vehicle were directed to get out. Duriech noticed that a narcotics dog was used to inspect the car. Defendant said to him that the military police had found something. Duriech was taken by military authorities from the area and questioned. He was released later to his unit. Duriech testified that he never saw anything used, except marijuana.

On cross-examination, Specialist Duriech stated that the "dugout" had been placed under the passenger seat of the car. He observed various "baggies" being pulled out of the car. Duriech stated that Defendant had not driven erratically, though she did have trouble negotiating the cones.

Private First Class Nicole Lovell was one of the military police officers on duty that morning. She testified that the vehicle driven by Defendant approached the checkpoint and was directed to stop. PFC Lovell noted that Defendant was driving and that she had trouble with the area marked off by traffic cones. Once the vehicle came to a stop, PFC Lovell directed all persons to step out. She testified that the minute the window was rolled down that there was the strong smell of marijuana.

After the four individuals left the vehicle, the narcotics dog was used to inspect the vehicle. PFC Lovell searched the passenger side of the vehicle, along with Defendant's purse. Items were found in the glovebox. In Defendant's purse, PFC Lovell found notebook paper and residue. She testified that no drugs were found in the rear seat.

PFC Lovell testified that she could identify the smell of marijuana but was unable to recognize other drugs, including methamphetamine. She put various items into evidence bags and then forwarded them to the evidence custodian. Various items believed to be narcotics were seized, and Defendant was arrested.

Michael Johnson testified that he is a military police investigator and was on duty on March 28, 1998. He is assigned to the drug suppression unit. The items seized from the car Defendant was driving were processed by him. He used a field test on some leafy material which tested positive for marijuana. He used a different test on other materials which tested positive for methamphetamine. He finally testified that he interviewed Defendant who admitted that the methamphetamine was hers, but the marijuana was not. Mr. Johnson also indicated that Defendant appeared to be under the influence of drugs and alcohol.

Another military police investigator, Christopher Armentrout, testified that he also had field tested various substances that had been taken into custody as evidence. The "dugout" tested positive for marijuana.

Defendant was charged by information with two misdemeanor counts under 21 U.S.C. § 844. The prosecution has maintained that Defendant was in possession of both marijuana and methamphetamine. Defendant pled not guilty to the charges. In addition, Defendant filed a motion to suppress.

## II.

Defendant's motion to suppress was premised on a lack of justification for use of the narcotics dog. Defendant has argued that there was no probable cause for the search by the dog and that no consent took place. The prosecution filed a response to the motion.

The issues involved in this motion are substantially more complex than perceived by either side in this case. The evidence indicates that Defendant drove onto Fort Carson

through Gate 20. This gate was open at the time, and Defendant was not stopped or required to show any identification prior to entrance onto the base. From the evidence, it does not appear that any military person was on duty at the time Defendant drove through Gate 20.

The prosecution has indicated in its response to the motion to suppress that a sign was posted at Gate 20 which indicated that anyone entering onto Fort Carson consented to a search upon request. There is not one scintilla of evidence in the record to support this assertion.

The evidence substantiates that the checkpoint for vehicles was approximately 200 meters inside Gate 20. Though it is unclear, it does appear that all vehicles were being stopped in the early morning hours of March 28, 1998. The testimony of PFC Lovell indicated that all persons were being directed to exit those vehicles and that the narcotics dog was being used then to search the vehicles for contraband. It is clear to the Court that Defendant and the passengers had no options when the vehicle was stopped. The car was going to be searched, which included the use of the narcotics dog. There was no issue of consent, because the decision to search the vehicle Defendant was driving was a fait accompli. Defendant could have objected, but it would have accomplished nothing.

The prosecution has argued that military installations have been viewed differently from civilian settings, citing *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976). The prosecution has further argued that Defendant impliedly gave her consent for a search when she entered onto the base. The issue is not that easily resolved, especially in light of the facts presented to this Court.

■ Courts have shown great deference to the special needs of the Armed Forces at military and naval installations. *Id.* Military bases can be closed to the public without offending any constitutional provision. *Brown v. Palmer*, 944 F.2d 732 (10th Cir. 1991) (en banc) (annual open house held by Air Force did not turn military base into public forum); *Persons for Free Speech at SAC v. United States Air Force*, 675 F.2d

1010 (8th Cir.1982) (en banc) (no public forum created by opening base to public for one day). Military commanders have the authority to bar entrance by specific individuals pursuant to 18 U.S.C. § 1382. *United States v. Albertini*, 472 U.S. 675, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985). On the other hand, military commanders cannot bar individuals from areas where military control has been abandoned. *Flower v. United States*, 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972).

■ The case law has evolved to differentiate between a closed military base and an open military base. At a closed base, all individuals and vehicles are stopped at a gate and either granted or denied permission to enter. On a closed military base, courts have held that probable cause under the Fourth Amendment need not exist before a search occurs. *United States v. Jenkins*, 986 F.2d 76 (4th Cir.1993); *United States v. Ellis*, 547 F.2d 863 (5th Cir.1977); *United States v. Vaughan*, 475 F.2d 1262 (10th Cir.1973). The rationale is that national security requires the ability of military officials to conduct searches to protect the military installation. *United States v. Jenkins*, 986 F.2d at 78–79. An individual has a choice of either seeking admission to a closed base or not. Once the decision is made by an individual to enter onto the closed base, then it may be assumed that permission to conduct a search without probable cause is granted by that individual. *Id.* at 79; *United States v. Ellis*, 547 F.2d 863, 866 (5th Cir.1977).

■ The status of an open base is different. Though the formal requirements of probable cause supported by oath and affirmation may not be necessary, there still must be probable cause before a search is conducted. *United States v. Burrow*, 396 F.Supp. 890 (D.Md.1975) (civilians not subject to a general warrantless search in situations not evidencing a particular need for security or involving exigent circumstances); *Wallis v. O'Kier*, 491 F.2d 1323 (10th Cir.1974); *United States v. Fox*, 407 F.Supp. 857 (W.D.Okla. 1975).

The situation before this Court involves a military base that was not closed during the

early morning hours of March 28, 1998. By the same token, Fort Carson had placed a guard facility at Gate 20, and presumably at every other entrance. The prosecution notes in its response to the motion to suppress that vehicles are not traditionally stopped at each gate, but occasionally they are. Response to Defendant's Motion to Suppress, p. 2. It is further noted that a gate, even if open, denotes the separation from the civilian and military worlds. Thus, Fort Carson involves a far different situation than found by the United States Supreme Court in *Flower v. United States, supra.* In that case, a major city street ran through Fort Sam Houston in San Antonio, Texas, carrying thousands of cars each day from one part of the city to another. No gate house existed at the entrances nor was there apparently any effort to block traffic from coming onto the base at any time.

The evidence in this case indicates that Defendant passed through Gate 20, a clearly marked demarcation between the base and outside world. The standard then for a search would require probable cause, but would not require the same under oath or affirmation. *United States v. Burrow, supra.* The evidence further substantiates that a random checkpoint had been established by military police authorities to check all vehicles and individuals travelling on the roadway inside of Gate 20. No evidence was presented that random checkpoints had been established at all or any other entrance.

■ Examination of the facts of this case and applicable case law leads to five conclusions. First, the evidence indicates that PFC Lovell smelled marijuana when Defendant rolled down the window of the vehicle. PFC Lovell testified that she was familiar with the smell of marijuana from training and personal life experiences. Even though the policy at the check point was to search all vehicles and individuals, probable cause existed at the time Defendant and all individuals were directed to step from the vehicle. *See, e.g., United States v. Santiago,* 846 F.Supp. 1486 (D.Wyo.1994). There was no need to obtain a warrant under oath or affirmation for the search of the vehicle, as probable cause did exist.

■ Second, the "automobile exception" existed at the time Defendant was stopped. Since probable cause existed that indicated marijuana was located in the vehicle, no warrant was necessary in order to conduct a search of the vehicle. *United States v. Burrow,* 396 F.Supp. at 903. The vehicle was easily moved and a need existed for search of the vehicle at the time it was stopped.

■ Third, the search of the interior of the vehicle and Defendant's purse was not impermissible. Defendant has argued that she had an expectation of privacy and the search of her purse required probable cause and a warrant. *United States v. Elliott,* 107 F.3d 810 (10th Cir.1997). Defendant's argument is invalid when the chain of events is examined carefully. PFC Lovell had probable cause to search the vehicle once the window was rolled down and the smell of marijuana was noticed. The use of the narcotics dog was permissible at that point. *United States v. Hunnicutt,* 135 F.3d 1345, 1350 (10th Cir.1998). Once the dog alerted on the purse, probable cause existed to search the purse. No warrant was necessary at that time.

■ Fourth, the checkpoint established by military authorities on March 28, 1998 did not constitute a violation of any constitutional provision. *See United States v. Dillon,* 983 F.Supp. 1037 (D.Kan.1997); *United States v. Santiago, supra.* Deference must be granted to military commanders to allow them to maintain security on a base, even if that base is open. *See, e.g., Romo v. Champion,* 46 F.3d 1013 (10th Cir.1995) (deference granted to prison officials to allow a checkpoint on a road leading to an entrance of a state prison). There is no evidence that Defendant was singled out or treated any differently from any other driver.

■ Fifth, nothing was presented to the Court that indicated that any statement made by Defendant to military police officials was coerced, forced, or in contravention of any established case law. The testimony established that Defendant was advised of her rights and then chose to speak to the officers. No basis has been presented that

would warrant a finding that the statement was involuntarily made or given after an improper advisement of rights.

Based upon the facts and the applicable law, there is no basis upon which this Court should suppress any evidence seized on March 28, 1998. Defendant's motion to suppress will be denied.

### III.

The prosecution has argued that it has proven all elements of both charges contained in the Information. Defendant disputes this, but both sides agree that no formal laboratory test was done on the materials found in the vehicle.

*Marijuana Charge:* Count 1 charges that Defendant knowingly or intentionally possessed marijuana on March 28, 1998. This is alleged to be in violation of 21 U.S.C. § 844.

The prosecution conceded at trial that no laboratory test was made on the suspected marijuana. The prosecution argued that the charge could be proven without any laboratory test. *United States v. Sanchez DeFundora,* 893 F.2d 1173 (10th Cir.1990). In addition, the prosecution argued that it produced the testimony of Specialist Duriech who was familiar with marijuana and that a field test established that the substance was marijuana.

■ The evidence as to the alleged marijuana indicated the following. Specialist Duriech had observed Defendant and her friend smoking marijuana during the course of the evening. They had used the wooden box found in the vehicle. He was offered marijuana, but refused. PFC Lovell recognized the smell of marijuana when it came through the window of the vehicle. The Court is satisfied that both Duriech and Lovell did recognize the smell of marijuana. The Court is satisfied that what was in the vehicle was marijuana.

■ Defendant in her conversation with the military police investigator denied any possession of the marijuana. In this case, the facts substantiate beyond a reasonable doubt that Defendant was at least in constructive possession of the marijuana in the vehicle. *United States v. Jones,* 49 F.3d 628, 632 (10th Cir.1995). In addition, Defendant knew that the substance was marijuana, as she had smoked some and offered part of it to Specialist Duriech. The prosecution has proven its case as to Count 1 beyond a reasonable doubt.

*Methamphetamine:* Count 2 of the Information charges that Defendant had possession of methamphetamine on March 28, 1998. This is alleged to have been in violation of 21 U.S.C. § 844.

The evidence as to this charge is very different from the marijuana charge. No evidence was presented that any methamphetamine had been used by Defendant during the time at issue in this case. Specialist Duriech testified that he saw no usage of the drug during the time he was in Defendant's presence.

No laboratory test was offered as to the substances purporting to be methamphetamine. The prosecution is basing its case on the field test done at some point and on the purported admission of Defendant. Thus, the prosecution has argued that it need not produce any laboratory analysis in order to substantiate its claim that the material was methamphetamine. *United States v. Sanchez DeFundora, supra.*

The Court listened carefully to the testimony given by the three military police officers. PFC Lovell indicated that she had searched Defendant's purse and notebook paper. She found material that she placed into evidence. PFC Lovell had never seen methamphetamine before and could not identify what the substance was. She testified that the suspected drugs were placed into evidence envelopes and given to a superior.

The testimony of Investigator Michael Johnson and Investigator Christopher Armentrout was confusing and conflicting. Both claim to have tested both the marijuana and suspected methamphetamine. Investigator Armentrout testified that he could not place which substance with what exhibit. The allegation was that the methamphetamine had been contained in small containers or wrapped in a piece of paper. It appears

that anything believed to be methamphetamine was mixed together.

 The concept of a chain of custody of physical evidence is to ensure that evidence is not lost, adulterated, or changed pending trial on the merits of a case. Where evidence is unique, readily identifiable, and resistant to change, then the foundation for consideration of evidence must support what its proponent claims the evidence to be. *United States v. Cardenas,* 864 F.2d 1528, 1531 (10th Cir.1989). A more stringent standard for chain of custody must exist if an item is not unique or readily identifiable, and not resistant to change.

In this case, the testimony is contradictory at best. The Court does not know who actually tested the suspected methamphetamine or whether it was tested twice. From the testimony given, the Court finds that all suspected methamphetamine was combined. The evidence was not as it was found in the vehicle or purse.

The Tenth Circuit has held that the standard for admission of evidence is that it must be substantially in the same condition as it was when the crime was committed. *United States v. Coffman,* 638 F.2d 192, 195–96 (10th Cir.1980). That is not the situation here. It was not in the same condition as when it was found.

Absent this Court accepting the results of the field test(s) by military police, there is no credible evidence that the substances seized from the vehicle were methamphetamine. The Court finds that the suspected drugs were improperly handled and combined. The Court further finds that the confusion and contradiction between the witnesses, as well as the conflicts related to the physical evidence, create a reasonable doubt in favor of Defendant.

This Court holds that the handling of the suspected methamphetamine in this case was not done in a fashion expected for this type of charge. There is a reasonable doubt that will be resolved in favor of Defendant.

IT IS HEREBY ORDERED that Defendant's motion to suppress is denied; and

IT IS FURTHER ORDERED that Defendant is found guilty of the charge of possession of Marijuana, as contained in Count 1 of the Information; and

IT IS FURTHER ORDERED that Defendant is found not guilty of Count 2, possession of methamphetamine.